CHARLES L. REES
California State Bar No. 200682
**LAW OFFICES OF CHARLES L. REES**
424 F Street, Suite 205
San Diego, California 92101
Telephone: (619) 239-9300
Facsimile: (619) 702-5415

Attorney for
Luis Chavez

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE DANA M. SABRAW)**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CASE NO.: 21CR1021-DMS |
| Plaintiff, ) | |
| ) | DATE: June 30, 2022 |
| v. ) | TIME: 9:30 A.M. |
| ) | |
| LUIS CHAVEZ, ) | |
| ) | **DEFENDANT'S SENTENCING** |
| Defendant. ) | **MEMORANDUM** |
| ) | |

TO: RANDY S. GROSSMAN, ACTING UNITED STATES ATTORNEY, and NICOLE E. BREDARIOL, SPECIAL ASSISTANT UNITED STATES ATTORNEY:

The defendant, Luis Chavez, by and through his attorney, Charles L. Rees, hereby files the following Sentencing Memorandum.

//

//

//

//

//

//

## I.

## SENTENCING REQUEST

Luis Chavez and Luis Marin await sentencing for possessing cocaine with intent to distribute on board a vessel in violation of 46 U.S.C. § 70503.[1] They were arrested by the United States Coast Guard on March 18, 2021, in international waters approximately 655 nautical miles west of the Galapagos Islands, Ecuador after 200 packages of cocaine, weighing 1,000 kilograms, were discovered in a hidden compartment in the boat they were navigating. Mr. Chavez and Mr. Marin pled guilty to the charge pursuant to a plea agreement with the Government. At sentencing, counsel for Mr. Chavez and Mr. Marin will request a sentence of 48 months' custody. Probation recommends a sentence of 60 months. The Government recommends 84 months.

Mr. Chavez is a 33-year-old fisherman, husband, and father of three young children. Like many from his small fishing village of Jaramijo, in the Manabí province of Ecuador, he has lived in extreme poverty since he was a child. Over the years, Mr. Chavez has lived without running water, had his home destroyed by a 7.8 magnitude earthquake in 2016, lived in shelters with his wife and kids, had another home destroyed by a fire, and supported his family on as little as $5.00 a week working as a fisherman, a line of work he started at age 16. Indeed, it is one of the few "good paying" jobs in Jaramijo available to someone with only a 6th grade education. A job in which Mr. Chavez and other fishermen from his village competed for work each day, walking the docks in search of someone who might hire them to go out to sea to fish for one or several days at a time. A job that compensates fishermen based on the quality and quantity of fish caught. An unsuccessful fishing trip, even one lasting several days, usually results in no pay for the unlucky fishermen on board.

---

[1] Mr. Chavez and Mr. Marin also pled guilty to possessing methamphetamine with intent to distribute on board a vessel in violation of 46 U.S.C. § 7503. This was based on the Government's initial claim that one of the packages in the boat contained methamphetamine. Laboratory analysis later revealed the package in question was cocaine. As a result, the Government will move to dismiss the methamphetamine count at sentencing.

It was a fishing job that brought Mr. Chavez and co-defendant Marin into the instant offense. It wasn't until they were miles from home on the open sea - after being met by a larger boat with several men - that Mr. Chavez realized that they were expected to transport drugs. Although he was not threatened, Mr. Chavez felt vulnerable, hours from home on the open sea, and doubted the people behind the drug load would simply escort him home unscathed. Mr. Chavez and co-defendant Marin did as they were told and were promised a payment of $30,000 to $35,000 if they successfully piloted the boat to Mexico. His decision to navigate the drug boat toward Mexico is one he deeply regrets.

As will be discussed herein, Mr. Chavez's actions in this case do not reflect his true character. He remains a hardworking, loyal and loving husband and father whose desire to provide for his family clouded his otherwise good judgment. At sentencing, counsel for Mr. Chavez will request a sentence of 4 years' custody. A sentence of 4 years' is warranted for the reasons that follow.

## II.

## RELEVANT BACKGROUND

**1.     The Plea Agreement**

On September 29, 2021, Mr. Chavez entered a guilty plea to Counts 2-3 of the Indictment. His guilty plea was pursuant to a plea agreement (the "Agreement") containing the following terms:

| | |
|---|---|
| Base Offense Level | 38 |
| Safety-Valve | -2 |
| Acceptance of Responsibility | -3 |

[Agreement at p. 9.] The Agreement further provided that if Mr. Chavez was safety-valve eligible, the Government would recommend a sentence of 84 months. [Id. at p. 11.] Following his guilty plea, AUSA Bredariol and two agents met with Mr. Chavez to determine his eligibility for safety-valve. The Government concluded Mr. Chavez was truthful in his telling of the events and recommend a 2-level reduction for safety-valve. [Government Sentencing Summary Chart ("Govt. SSC.") at p. 2.]

**2.     Safety-Valve Information: Mr. Chavez's Involvement**

Mr. Chavez informed AUSA Bredariol and the agents that he did not initially intend to transport drugs on the high seas. Rather, he was in search of a fishing job at the dock when a man offered him $150 to fish out at sea for several days. He accepted the offer and was told to pack his things and return to the dock. When he arrived, co-defendant Marin was there and together they traveled by water taxi for approximately two hours where they boarded a bigger boat. On board were several other men. While on the bigger boat, Mr. Chavez learned that the real reason they were hired was to pilot a Go Fast Vessel ("GFV") containing some type and quantity of drugs to Mexico. Although neither he nor co-defendant Marin were threatened, they both felt they were in no position to refuse. They were also told they would be paid $30,000 to $35,000 in exchange for piloting the boat to Mexico. When Mr. Chavez asked the smugglers how they would get back to Ecuador, he was told that the people who received them in Mexico would arrange for their return home. Mr. Chavez never learned the type nor quantity of the drugs on the boat. He did, however, assist with the navigation of the boat to its intended destination of Mexico, including stopping along the way for refueling vessels. Additionally, he utilized GPS and a radio, both given to him by the individuals behind this smuggling venture, to maintain communication with those coordinating the GFV load. Finally, he informed the agents that the smugglers told him to use the radio they provided him, on a specific channel, to reach out to a contact person as the GFV approached Mexico.

### III.

### MINOR ROLE

A defendant may receive a two-level adjustment for minor role in a drug smuggling offense even if he is the only person charged in the offense so long as the Government is aware of other participants behind the load. [See USSG § 3B1.2 at Application Note 2.] Whether a minor role adjustment is warranted depends on the totality of the circumstances and the facts of the particular case. [See id. at Application Note 3C.] The facts of this case reveal a minor role reduction is warranted.

Mr. Chavez did not become aware the "fishing" job he accepted was actually a maritime smuggling venture until he and co-defendant Marin were several miles out to sea. Although they were not threatened, neither believed they could back out unscathed. Mr. Chavez had no proprietary interest in the drugs, did not know the value of the drugs, the type or quantity of the drugs and had no decision making authority. Additionally, this was Mr. Chavez's first smuggling venture. While he hoped the individuals behind this load would follow through on their promise of $30,000 to $35,000, neither he nor Mr. Marin received any money.

The Government raises two main arguments against a minor role reduction. First, the Government claims that Mr. Chavez possessed a special skill - the ability to navigate a boat on the open sea for several days - which sets him apart from the land-based drug smuggling ventures for which minor role is often applied at sentencing. Second, the Government argues that defendants were responsible for a much larger quantity of drugs in this case which puts them in a different class than land-based smuggling defendants.

While the means of transport and the amount of drugs involved in this case may be different, it is overall strikingly similar with the typical "border-bust" seen in this district. In both types of smuggling ventures, the person or organization behind the load typically seek out individuals in severe financial distress to transport drugs. The person hired to do the transporting is often the only person held responsible for the smuggling venture while the people behind the load are very rarely held accountable.

The skill required to transport drugs in both types of cases is relative to a defendant's environment. For the typical border-bust, the skill required of a willing courier is the ability to drive a car or walk across the border with drugs strapped to your body. As most people in our district are bipeds and have the ability to drive a car, these skills are easy to come by. In a place like Jaramijo, Ecuador, the skill required to transport drugs is the ability to navigate a boat on the open sea for several days. As the main industry in Jaramijo is fishing, most men not only know how to navigate a boat at sea for several days, they have

been doing so since before they became adults.[2] In other words, Mr. Chavez's ability to navigate a boat is not a special skill in Jaramijo. If Mr. Chavez didn't wander the dock asking for work on that fateful day, the people behind this load would have found another fisherman from Jarmijo desperate for work.

Mr. Chavez's level of responsibility over this load is no greater than what is exercised by defendants in the typical border-bust. Mr. Chavez was told where to go, how to communicate with others involved in the venture and when, and was given limited information about the drugs on board the GFV. Like a border-bust, he was given a vehicle and told to drive. In fact, in some ways, Mr. Chavez had even less responsibility than the typical border-bust defendant. For example, the individuals behind this load had a tracker hidden in the bricks of cocaine and could, therefore, trace the GFV's position at all times. [See Presentence Report ("PSR") at ¶ 5.] If Mr. Chavez decided to veer off course and flee to safety, or take the drugs somewhere other than Mexico and sell them for his own profit, he would have been quickly tracked by the people behind this load. In other words, Mr. Chavez was not trusted to do as he was told and was monitored at all times. The fact that the boat contained 1,000 kilograms of cocaine as opposed to the typical border-bust involving less than 100 kilos of narcotics does not support the Government's position that Mr. Chavez must have therefore been more indispensable or trusted. Rather, it is again a consequence of the environment in which the drug trafficking is taking place. A car in a border-bust is simply not capable of concealing as much drugs as a GFV. Regardless of the amount or value of the drugs on the GFV, the fact remains that the individuals behind this load operated in the same manner as individuals behind border-busts: they found an ordinary person, with no special skill within their environment, under great financial pressure to transport drugs and willing to take orders. For all these reasons, it is requested that the Court adjust Mr. Chavez's sentence for minor role. Should the Court decline to

---

[2] It is not uncommon for fishermen from Mr. Chavez's village to spend several weeks and even months at sea fishing.

adjust downward for minor role, it is respectfully requested that the factors discussed above be considered under 18 U.S.C. § 3553(a).

## IV.
## 18 U.S.C. § 3553(a)[3]

Mr. Chavez was born in Jarmijo, Ecuador where he lived with his parents and four siblings. [PSR at ¶ 36.] He describes his childhood as "humble and hardworking." [Id. at ¶ 38.] His father was, and remains, an alcoholic. He separated from Mr. Chavez's mother when Mr. Chavez was ten. His mother was left alone to raise Mr. Chavez and his four siblings. To help support the family, Mr. Chavez dropped out of school and worked selling oranges and shining shoes. His two older brothers worked as fishermen. When Mr. Chavez turned 16, he too became a fisherman, joining his brothers on long journeys at sea. The income he and his brothers made fishing helped the family put food on the table, yet they still lived in poverty. Mr. Chavez recalls growing up without running water in his home. [Id.]

In 2005, Mr. Chavez began a relationship with Alejandra Rosado. They married in 2008, and together they have three children. [Id. at ¶ 39.] Ms. Rosado describes Mr. Chavez as a "good" and "humble" man who never stopped working to provide for his family. With each setback the family faced, Mr. Chavez persevered. He went to the docks in search of work on a fishing boat. When he found work, he could be gone for a few days, several weeks or even months at a time. If there was no work fishing, he sold fish in the village. If there was no fish to sell in the village he worked odd construction jobs. He persevered when his home was destroyed by the April 16, 2016, earthquake that rocked Ecuador

---

[3] Some of the information provided in this section comes from letters from Mr. Chavez's wife and his daughter. Mr. Chavez's family had difficulty writing and mailing letters to defense counsel. After several months, Mr. Chavez's family provided the letters to defense counsel with the help of a family friend on June 23, 2022. The letters are in Spanish, however, and are currently being translated. They will most likely be brought to Court on the date of sentencing.

killing 700 people.[4]  He persevered when he and his family were then forced to live in a government shelter for two years.  He persevered when the government shelter they lived in was destroyed in a fire.  Mr. Chavez persevered when the Covid-19 pandemic devastated an already weak Ecuadorian economy.  With each setback, Mr. Chavez got up each day and looked for work.  He didn't turn to alcohol like his father or brothers. [Id. at ¶¶ 36-37.] Nor did he turn to criminal activity to support his family. [See id at ¶ 31.]

  Mr. Chavez also worked hard to be a good father to his children.  Not wanting to follow in the footsteps of his absent father, he took a proactive role in the daily lives of his children, taking them to school and doctor's appointments.  Most important, he provided his kids with emotional support.  His daughter describes Mr. Chavez as a "loving" and "caring father" with a "big heart" and "the best father in the world."

  Since his incarceration, Mr. Chavez has taken steps to plan for his future.  While at GEO, he received several certificates of achievement in courses designed to improve his life. [Certificates of Achievement in Support of Sentencing at Exs. A-D.] He has also maintained contact with his wife and kids and has done his best to remain a part of their lives.  His wife is the sole provider for the family, selling fish in the village while the kids are at school.  Unfortunately, Mr. Chavez's parents and siblings also struggle financially and have no extra income to help his wife and kids while he serves the remainder of his sentence.  Mr. Chavez understands he must serve a lengthy prison sentence for his involvement in this case and is truly remorseful for his involvement with drugs.  It is respectfully submitted, however, that a sentence of 4 years is sufficient to punish him for his actions and deter other individuals contemplating a maritime smuggling venture.  For all these reasons, and more to be discussed at sentencing, it is requested that the Court sentence Mr. Chavez to 48 months' custody.

//

---

[4] An estimated 35,000 homes were destroyed or badly damaged by the April 16, 2016, earthquake, leaving 100,000 people in need of shelter.

## V.

## CONCLUSION

For the foregoing reasons, it is respectfully requested that the Court sentence Mr. Chavez to a custodial sentence of 48 Months. Additionally, Mr. Chavez requests that the Court recommend to the Bureau of Prisons placement at FCI, Terminal Island.

Dated: June 24, 2022

/s/ Charles L. Rees
CHARLES L. REES
Attorney for Luis Chavez